OPINION OF THE COURT
Kenneth L. Gartner, J.
This small claims action compels this court to confront a sit- *341 nation in which the Legislature — at least as its applicable enactment has been interpreted by the Appellate Division— has barred a class of victims of attorney neglect from obtaining compensation. On the instant facts, however, this court is required to distinguish the Appellate Division decision and rule that the plaintiffs do not fall into this disfavored class.
The plaintiffs are a mother and two children. The defendant is an attorney who represented all three in the sale of the home of the children’s grandmother, in which the mother and two children all held interests. Instead of placing the $84,613.92 proceeds attributed to the children in an interest-bearing account, however, the defendant placed it in an IOLA account, which earned no interest at all for the plaintiffs. The funds remained in the IOLA account for a year and a half before the attorney received court authorization to pay the proceeds over to the children. The defendant’s only explanation was that when the funds were initially turned over to him, he thought that the funds would remain in the IOLA account for only about three months. The plaintiffs seek the recovery of interest not at the statutory rate, but at the lower rate paid on the bank account where the plaintiff mother’s separate funds were for six months held.
Judiciary Law § 497 (1) provides that “[a]n ‘interest on lawyer account’ or TOLA’ is an unsegregated interest-bearing deposit account with a banking institution for the deposit by an attorney of qualified funds.”
Judiciary Law § 497 (2) provides that for purposes of placement in an IOLA, “ ‘[qjualified funds’ are moneys received by an attorney in a fiduciary capacity from a client or beneficial, owner and which, in the judgment of the attorney, are too small in amount or are reasonably expected to be held for too short a time to generate sufficient interest income to justify the expense of administering a segregated account for the benefit of the client or beneficial owner.”
As observed in Schmidt v Fleet Bank (NYLJ, Mar. 6, 2000, at 26, col 1 [Sup Ct, NY County, Ramos, J.]), “[t]he interest earned on an IOLA account is remitted by the banking institution directly to the IOLA fund for disbursement to nonprofit legal services providers to finance the delivery of legal services in civil matters for poor persons.”
Doubts have been expressed about this scheme. One of the authors of the law — as counsel to a sponsor of the legislation by which it was enacted — has confessed to having second thoughts on equitable grounds. As stated by him, “money in *342 the IOLA fund really belongs to law clients. Whether they know it or not, their generosity in allowing interest earned on their money while sitting idle in a lawyer’s trust account to be paid into the fund provides access to justice to people who could not otherwise afford it. * * * I personally believe that as a lawyer, I would have an obligation to tell my client where any interest earned on his or her funds is going to go and further explain that there may be other options that the client might prefer. In this day of highly automated banking and accounting, there is no reason why even very small sums held for a very short time cannot be put to work for their owners.” (O’Neill, A Suggestion for IOLA Funds, NYLJ, July 11, 1995, at 2, col 6.)
In NY State Bar Association Committee on Professional Ethics Opinion 575 (1986), the committee observed that in 1968, at a time when withdrawals from interest-bearing bank accounts were generally subject to notice and a waiting period, that same state bar committee had opined that such restrictions might conflict with the client’s right and desire for prompt payment, and that the client’s instruction should therefore be sought.
Such restrictions are no longer of general applicability, thus presumably removing this as an excuse for an attorney failing to place funds in an interest-bearing account. However, in ABA Committee on Ethics and Professional Responsibility Formal Opinion 342 (1975), the committee observed that client funds were generally commingled and left uninvested because of the administrative expense of establishing a separate account for each client and the impracticability of calculating and allocating interest on commingled funds — the same interest identified by the Judiciary Law as justifying the placement of such funds in IOLAs.
In NY State Bar Association Committee on Professional Ethics Opinion 554 (1983), the state bar committee opined: “Where a lawyer holds a sum for a client which is sufficient to earn interest, the lawyer has a fiduciary obligation to invest that sum, 2 Scott, Law of Trusts, Sections 180.3, 181 (3d ed. 1967) $ * * »
Most recently, in Formal Opinion 1995-6, the Committee on Professional and Judicial Ethics of the Association of the Bar of the City of New York concluded that although the code does not specifically require that lawyers hold client funds in interest-bearing accounts, the failure to invest client funds, taking into account the amount of funds held for a specific cli *343 ent and the expected holding period, may in some circumstances constitute neglect. The city bar committee opined: “It is the view of this Committee that, given the size of the fund and available interest rates, if the fund is likely to be retained in escrow for a period of a year or more, a separate interest-bearing trust account for the client may be ethically required.” Indeed, at least where a demand has been made, an attorney has been judicially determined to bear liability for breach of his general fiduciary duty where he fails to place funds in an interest-bearing account. (McCarthy v Philippine Natl. Bank, 690 F Supp 1323 [SD NY 1988].)
Thus, it may well be that the attorney here breached his ethical and fiduciary obligations by failing for a year and a half to ensure that the almost $85,000 entrusted to him was maintained at a productive interest rate for the benefit of his clients.
Notably, despite any such breach, the plaintiffs would not be eligible for compensation from the Lawyers’ Fund for Client Protection since the loss did not result from any “dishonest conduct” of the attorney. (22 NYCRR 7200.8.) Rather, the plaintiffs’ only recourse for honest but negligent conduct would be in an action such as the instant one seeking to establish civil liability.
While the attorney’s ethical and fiduciary obligations may have been breached, this would not end the analysis. The question of the attorney’s liability implicates a statute which has been given a broad construction by the Appellate Division.
Judiciary Law § 497 (4) (b) provides that “[t]he decision as to whether funds are of nominal amount or expected to be held for a short period of time rests exclusively in the sound judgment of the lawyer or law firm.”
Judiciary Law § 497 (5) provides that “[n]o attorney or law firm shall be liable in damages * * * because of a deposit of moneys to an IOLA account pursuant to a judgment in good faith that such moneys were qualified funds.”
In Takayama v Schaefer (240 AD2d 21 [2d Dept 1998]), the attorney for the seller in a real estate transaction received, as escrow agent, a $12,000 down payment from the purchaser. The attorney deposited the down payment into his IOLA account. After the underlying deal fell apart, and while the parties to the transaction litigated ownership of the funds, the attorney kept the money in his IOLA account for 4V2 years. The purchaser’s attorney never made a demand for the transfer *344 of the funds to an interest-bearing account. After trial in New York City Civil Court, the purchaser was awarded judgment requiring the attorney to pay the purchaser not only the $12,000, but, in addition, over $5,000 in interest. On appeal, the Appellate Term affirmed, observing that by failing to pay the sum into court, the attorney “subjected himself to liability for interest and costs.” In a 3 to 2 decision, the Appellate Division, however, reversed, holding (240 AD2d at 26):
“Judiciary Law § 497 (5) absolves an attorney from liability for the ‘good faith’ placement of escrow monies in an IOLA account and * * * the appellant’s good faith was never questioned or even raised at any point in the proceedings. This is not to say that there are no circumstances under which an attorney may be held responsible or that the safe-harbor provision of Judiciary Law § 497 (5) has no limits. In the case before us, however, * * * we find no basis to impose personal liability on the appellant.”
Justice Luciano, with Justice Copertino joining him, dissented. Justice Luciano observed (at 28) that it was likely that “if the funds held in escrow had belonged to the [attorney], he would have taken whatever actions were necessary to maintain their productivity,” and that the attorney therefore “should have maintained the productivity of the funds for the benefit of the buyer.” Justice Luciano opined that while under the literal text of the statute the attorney could not be held liable for the “initial placement” of the funds in an IOLA account, a breach of fiduciary duty from whose consequences the Judiciary Law did not insulate the attorney occurred when the attorney “permitted the funds to remain in the short-term account when it became evident to him that there was a conflict between the buyer and seller which would not be resolved without resort to litigation of an indeterminate duration * * * ” (240 AD2d at 29 [emphasis added]).
In the instant case, in contrast to the situation in Takayama, the plaintiffs were not adverse to some client of the instant defendant and therefore represented by independent counsel who might have been expected to make a demand regarding the placement of the funds in an interest-bearing account. The plaintiffs were themselves clients of the instant defendant and dependent upon him for advice. While the period for which the funds were kept in the IOLA account was of shorter duration than the exceptionally long period found unobjectionable by *345 the majority in Takayama, it was for 50% longer than what the city bar committee has identified as the ethical maximum. The sum involved — $85,000—was substantially greater than the $12,000 involved in Takayama.
The question is, are these facts sufficient to distinguish this case from Takayama? Is the implication of Takayama that the statute’s placement of judgment “exclusively” in the hands of the attorney, with only a “bad faith” exception, absolutely insulates an attorney from liability for the placement of any sum of money for any duration, absent of proof of actual intent to injure? Or is the implication of Takayama’s comment that there are “limits” to the safe-harbor provision, meant to indicate that if the size and duration of the deposit demonstrate the absence of the exercise of any judgment, then a “sound” judgment, or judgment “in good faith” could by definition not have been made, and the safe-harbor protection is therefore lost?
Exacerbating the present situation is the fact that the instant case was tried together with a companion case. The companion case was brought by two of the same plaintiffs against another attorney, who is a professional colleague of the instant defendant. The colleague had been appointed guardian ad litem of both children pursuant to a petition filed — on the instant defendant’s advice that it was required — despite the fact that the filing took place only a month and a half prior to one of the children attaining his majority. The colleague obtained his appointment as guardian ad litem a month after the child had attained his majority, commenced service a month and a half after the child had attained his majority, and continued thereafter to serve on behalf of both children in the transaction, which did not close until a year later. The former ward was required to commence the companion case to try and obtain damages in the sum of the pro rata share of so much of the fee of the guardian ad litem as was charged to him although he was in fact an adult not in need of such services.
In essence, the plaintiffs were placed by the two attorneys in a situation in which they were incurring liability for unnecessary services while simultaneously having their funds removed from the productivity which could have generated more than sufficient interest income to pay for those services.
Viewing the situation as a whole, this case presents a situation in which the limits, referred to by the Appellate Division *346 majority in Takayama, of Judiciary Law § 497 (5)’s safe-harbor provision, were exceeded. Judgment is awarded to the plaintiffs.