OPINION OF THE COURT
Edward H. Lehner, J.
The central legal issues presented on the motion of defendant Reiser to dismiss the cross claims asserted against him by his former client are (i) whether an attorney who drafted contracts of sale can be held liable for any loss of monies deposited with him as escrowee upon the failure of the bank in which the funds were deposited, and (ii) whether it is malpractice to allow $2,730,000 to remain in a noninterest bearing account for the period between the time of execution of a contract and the closing on a sale of a cooperative apartment.
Facts
On December 6, 2000 defendant Galina Kluge (Kluge), who is 85 years of age, entered into contracts for the sale to plaintiff of two apartments in the building owned as a cooperative at 50 Central Park West in Manhattan. The contract for apartment 12C was signed by Kluge in an individual capacity and the agreement for apartment 12B was executed by her in her capacity as executrix of the estate of her late husband Michael Kluge. Movant Reiser served as attorney for Kluge on the transaction. The purchase price for the two apartments totaled $14,500,000, and 10% thereof was deposited with Reiser in escrow, to be held in a noninterest bearing IOLA account. Such account is governed by the provisions of Judiciary Law § 497.
The monies were deposited by Reiser, as specifically provided in the contracts, in a New York branch of the Connecticut Bank of Commerce (CBC), which is where Reiser’s law firm maintained its accounts. The closing was to take place within 10 days of the approval of the sale by the cooperative’s board of directors, but no later than March 31, 2001. Such approval was obtained in early March 2001, but as a consequence of a dispute as to the nature of alterations that could be made by plaintiff to the apartments, the contracts did not close. The main action herein requires a determination as to whether plaintiff or Kluge is the party entitled to the aforesaid deposit monies. As a result of the litigation, a letter was executed by Reiser and *233 plaintiffs attorney dated March 15, 2001 providing that, pending resolution of the instant suit, the escrowed monies were to be removed from the IOLA account and deposited in an interest bearing account, which transfer plaintiffs attorney believed had been accomplished (transcript at 30).
In light of the fact that the contracts with plaintiff did not close, on March 8, 2002 Kluge entered into contracts for the sale of the aforesaid two apartments to Jon Stryker for a total purchase price of $12,800,000, and a deposit of $1,280,000 was paid to Reiser to be held in escrow pending the closing. Reiser again represented Kluge on the transaction and the contracts again provided that the funds be deposited in CBC. The closing on that transaction occurred on June 28, 2002. On that date Reiser drew checks on the escrow account he maintained at CBC. However, allegedly unknown to the parties, two days earlier CBC was closed by order of a Connecticut court on application of the Connecticut Commissioner of Banking, and the Federal Deposit Insurance Corporation (FDIC) was named receiver. As a consequence of the bank’s failure, the checks drawn by Reiser at the closing were dishonored. However, since Stryker made all of the payments required of him pursuant to the contracts, he is not a party to, nor in any way affected by, this litigation.
Plaintiff has asserted a claim against Reiser, who has now moved to dismiss same. However, by stipulation dated February 13, 2003, said parties have agreed to stay that claim pending the determination of the controversy between plaintiff and Kluge as to ownership of the deposit made by plaintiff.
All four contracts involved herein provide (fi 28.5) that the escrowee “shall not be liable for any error in judgment or for any act done or step taken or omitted in good faith, or for any mistake of fact or law, except for escrowee’s own gross negligence or willful misconduct.”
Kluge has asserted eight cross claims against Reiser, which he has now moved to dismiss pursuant to CPLR 3211 (a) (1) and (7) and 3016 (b). Four of the claims relate to the deposits made by plaintiff and four relate to the Stryker deposits. The claims are: (i) malpractice by not depositing the escrowed funds “in some form of interest bearing account or instrument that would have been covered by FDIC insurance or taking some other steps to ensure preservation of those funds” (fflf 120, 137); (ii) gross negligence by depositing all the escrowed funds in CBC; and (iii) breach of fiduciary duty in making the aforesaid deposits. In addition, with respect to the deposit made by *234 plaintiff, Kluge seeks indemnity from Reiser in the event plaintiff is ultimately determined to be entitled to a return thereof. The eighth claim alleges that Reiser miscalculated the amount owing under the New York City Real Property Transfer Tax in connection with the sale to Stryker.
To date, by reason of the $100,000 FDIC insurance per account and the sale of assets of CBC, approximately one third of the total of $2,730,000 deposited with CBC by Reiser has been returned to him. (Transcript at 11-14.)
Discussion
The above-quoted exculpatory provision in the contracts clearly only relates to Reiser’s duties as escrowee, not to his status as attorney for Kluge. Since the monies were deposited by Reiser in CBC in IOLA accounts as mandated by the contracts, the exculpatory provision is irrelevant to the claims asserted against him herein.
However, even if the provision could be interpreted to apply to Reiser’s duties as Kluge’s attorney, it could not result in a dismissal of her malpractice claims as any such provision would be subject to court scrutiny. Code of Professional Responsibility DR 6-102 (a) (22 NYCRR 1200.31 [a]) provides that a “lawyer shall not seek by contract or other means, to limit prospectively the lawyer’s individual liability to a client for malpractice.” In Swift v Choe (242 AD2d 188 [1st Dept 1998]), it was stated that “soliciting a client’s execution of a release during the course of representation violates [DR 6-102 (a) and] * * * a release obtained in violation of a disciplinary rule should not serve to shield a lawyer from liability before the facts and circumstances surrounding the execution of the document are fully examined” (at 192). In Mergler v Crystal Props. Assoc. (179 AD2d 177 [1st Dept 1992]), the Court referred to a line of cases “holding that an attorney who contracts with his or her client during the course of the attorney-client relationship must establish affirmatively that the agreement is in every respect free from fraud on the attorney’s part” (at 181). Thus, the exculpatory language of the contracts cannot be a basis for the granting of Reiser’s motion directed to the pleading.
The issue then presented is whether a claim for malpractice is stated based on Reiser drawing contracts pursuant to which $2,730,000 was deposited, pending the closings, in his escrow account in a relatively small Connecticut bank which has since failed.
“In o^der to sustain an action for legal malpractice, a plaintiff must prove the negligence of the attorney, that the negligence *235 was the proximate cause of the loss sustained and actual damages” (Gray v Wallman & Kramer, 184 AD2d 409, 413 [1st Dept 1992]). “An attorney is liable in a malpractice action if it can be proved that his conduct fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of the profession” (Bernstein v Oppenheim & Co., 160 AD2d 428, 430 [1st Dept 1990]). However, an “attorney is not held to the rule of infallibility and is not liable for an honest mistake of judgment where the proper course is open to reasonable doubt” (Grago v Robertson, 49 AD2d 645, 646 [3d Dept 1975]; see also, Rubinberg v Walker, 252 AD2d 466 [1st Dept 1998]). While the issue of “whether specific conduct constitutes [legal] malpractice normally requires a factual determination to be made by the jury * * *, the issue whether a pleading sufficiently states a cause of action for malpractice poses a question of law which [can] be determined on a motion to dismiss” (Prudential Ins. Co. of Am. v Dewey, Ballantine, Bushby, Palmer & Wood, 170 AD2d 108, 115 [1st Dept 1991] [internal quotation marks omitted], affd 80 NY2d 377 [1992]).
Plaintiff states that she expects to offer expert testimony opining that leaving such large sums in a relatively small bank for the periods contemplated by the contracts is a deviation from the generally accepted practice of lawyers handling such type of transactions. She states that she expects the testimony will indicate that under the circumstances presented security should have been procured by maintaining the monies in treasury bills or by obtaining supplementary insurance.
Reiser asserts that Kluge may not suffer any damages if the FDIC is able to recover monies by the sale of assets and other means sufficient to repay all depositors. However, that is no reason to now dismiss the claim. At present, it appears that only approximately one third of the monies deposited by Reiser in CBC has been returned to him. As a result, he has not paid to Kluge the amount to which she is entitled on the closing of the sale of the apartments to Stryker, who as aforesaid has fully complied with his obligations under the contracts.
While clearly an attorney is not a surety of the safety of a bank depository employed, under the circumstance presented plaintiffs complaint sufficiently sets forth a viable claim that it was malpractice for Reiser to have drafted contracts for Kluge providing that escrow monies totaling $2,730,000 be deposited in CBC without protection beyond the $100,000 per account FDIC insurance. Thus, although such claim might not survive a motion for summary judgment, plaintiff is entitled to have *236 the opportunity to offer expert opinion that in so drafting the agreements Reiser deviated from generally accepted standards for real estate practitioners. In this connection the court notes the recent Court of Appeals decision relating to expert testimony in Diaz v New York Downtown Hosp. (99 NY2d 542 [2002]). There it was stated that “[w]here the expert’s ultimate assertions are speculative or unsupported by any evidentiary foundation, * * * the opinion should be given no probative force and is insufficient to withstand summary judgment,” and that to defeat such a motion plaintiff must show “the existence of an accepted industry practice or standard” from which defendant deviated (at 544-545).
Although Kluge’s allegations are not clear with respect to her claims relating to the deposit of the escrow monies in IOLA accounts, the deposits in such type of accounts are clearly relevant only to the claim of loss of interest, and not to the loss of the principal amounts deposited.
Pursuant to Judiciary Law § 497, an attorney may deposit “qualified funds” in an IOLA account, the interest on which is paid by the depository to the interest on lawyer account fund (the fund) for distribution to nonprofit organizations that provide civil legal services to the poor, disabled and elderly (see, State Finance Law § 97-v [3] [a]). “Qualified funds” are defined in subdivision (2) of section 497 as “monies received by an attorney in a fiduciary capacity * * * and which, in the judgment of the attorney, are too small in amount or are reasonably expected to be held for too short a time to generate sufficient interest income to justify the expense of administering a segregated account.” Subdivision (4) (a) of State Finance Law § 97-v provides that the fund “shall establish by regulation a specific dollar amount equivalent to the cost of administering a segregated interest bearing account” and that such “dollar amount may be used by participating attorneys as a guide when determining whether the monies are qualified funds.” Pursuant to that statutory authority, the fund adopted a regulation (21 NYCRR 7000.10) which fixed that amount as $150.
Here the contracts with plaintiff and Stryker required deposits of $1,450,000 and $1,280,000, respectively. Thus, if each deposit were placed in an interest bearing account paying only one percent per year, it would generate income of over $1,000 per month per account. The closing of the Stryker transaction took place approximately 3V2 months after execution of the contract, and plaintiff received approval of the cooperative *237 board for his purchase approximately three months after execution of his contract, which periods of time are not uncommon in sales of cooperative apartments.
Thus, if CBC had not failed, the deposit of the escrowed monies in IOLA accounts would have resulted in Kluge not obtaining several thousand dollars of interest, well above the $150 guideline set forth in the regulations, but slight when compared to the selling price of the apartments.
Subdivision (4) (b) (i) and (ii) of section 497 provides that the decision “whether [the] funds are nominal in amount or expected to be held for a short period of time rests exclusively in the sound judgment of the lawyer,” who is to take into consideration “the amount of interest the funds would earn during the period they are expected to be deposited [and] the cost of establishing and administering the account.” Subdivision (5) states that no attorney “shall be held liable in damages nor held to answer for a charge of professional misconduct because of a deposit of moneys to an IOLA account pursuant to a judgment in good faith that such monies were qualified funds.”
In Takayama v Schaefer (240 AD2d 21 [2d Dept 1998]), the safe harbor provision of subdivision (5) was relied upon to exonerate an escrowee who held a $12,000 deposit in an IOLA account during four years of litigation, although the two dissenting Judges concluded that a breach of fiduciary duty occurred when the attorney failed to deposit the monies in an interest bearing account when it became evident that the funds would have to remain in escrow pending the outcome of the litigation. However, even the majority concluded that there are circumstances where subdivision (5) would not provide protection to an attorney employing an IOLA account. In Mann v Skidmore (193 Misc 2d 340 [Nassau Dist Ct 2002]), where the escrow deposit involved was $85,000, the court distinguished Takayama because of the much smaller amount involved there, and found that the retention of said sum for a year and a half in an IOLA account exceeded the limits of the statutory safe harbor provision.
Just recently the United States Supreme Court held in Brown v Legal Found, of Washington (538 US —, 123 S Ct 1406 [2003]) that since the Washington program only permits deposit of funds in IOLA type of accounts where there would be no net interest benefit to the owner of the funds, the deposit of escrowed monies in such an account was not an unconstitutional taking of property. In so concluding the court relied on *238 the concept that “the just compensation’ required by the Fifth Amendment is measured by the property owner’s loss rather than the government’s gain” (at 1419).
At this pleading stage, we do not know what knowledge Reiser may have imparted to Kluge with respect to the operation of IOLA accounts. Thus, considering that it would not appear that these significant amounts of monies deposited constitute “qualified funds” as defined by the statute, the motion to dismiss the portion of the cross claims seeking lost interest as a result of the alleged malpractice of Reiser in drafting contracts providing for the escrowed monies to be held in IOLA accounts is denied.
In an apparent effort to overcome the above-quoted exculpatory language of section 28.5 of the contracts, Kluge alleges that her losses were a result of “gross negligence” on the part of Reiser. Such term was held to constitute “conduct that evinces a reckless disregard for the rights of others or ‘smacks’ of intentional wrongdoing” (Colnaghi, U.S.A. v Jewelers Protection Servs., 81 NY2d 821, 823-824 [1993]; see also, Hartford Ins. Co. v Holmes Protection Group, 250 AD2d 526 [1st Dept 1998]). Clearly, the conduct alleged here does not approach such standard and thus the claims of gross negligence are dismissed.
The claims of breach of fiduciary duty and the claim for indemnity are also dismissed as they are duplicative of the legal malpractice causes of action (see, Daniels v Lebit, 299 AD2d 310 [2d Dept 2002]; Senise v Mackasek, 227 AD2d 184 [1st Dept 1996]).
The eighth cross claim alleges that Reiser overpaid the real property transfer tax owing pursuant to section 11-2102 (b) (1) (B) of the New York City Administrative Code. That statute calls for a tax, with respect to apartments selling for more than $500,000, of 1.425% of the consideration on the transfer of an “individual cooperative apartment,” and 2.625% with respect to “all other transfers.” Here the two apartments had not been combined into a single apartment. Under the circumstances, Reiser paid the tax based on the rate of 2.625% under the belief that two separate apartments were sold, both of which were beneficially owned by Kluge. Kluge contends that since two individual cooperative apartments were sold, the 1.425% rate should have been employed. The parties refer to various letter rulings issued by the City Finance Department to support their respective positions. However, since there apparently is still time to apply for a refund of any claimed over *239 charge and thus obtain an administrative ruling as to the propriety of Reiser’s action, the application to dismiss this claim of malpractice is denied with leave to renew.
In conclusion, the motion by Reiser to dismiss the cross claims interposed against him is denied with respect to the claims of malpractice asserted in the second, fifth and eighth cross claims, and is granted with respect to all other cross claims.